2012 COA 105

Luke SCHLAPP, by and through his parents Todd SCHLAPP and Leah Schlapp, Plaintiff–Appellant,

v.

COLORADO DEPARTMENT OF HEALTH CARE POLICY AND FINANCING and Mesa Developmental Services, Defendants–Appellees.

No. 11CA1726.

Colorado Court of Appeals, Div. I.

June 21, 2012.

Polsinelli Shughart PC, T. Jeffrey Fitzgerald, Denver, Colorado; Faegre Baker Daniels LLP, David W. Stark, Thomas W. Carroll, Denver, Colorado, for Plaintiff–Appellant.

John W. Suthers, Attorney General, Josh G. Urquhart, Assistant Attorney General, Joan E. Smith, Assistant Attorney General, Denver, Colorado, for Defendant–Appellee Colorado Department of Health Care Policy and Financing.

Bechtel & Santo, L.L.P., Betty C. Bechtel, Michael C. Santo, Grand Junction, Colorado, for Defendant–Appellee Mesa Developmental Services.

Opinion by Judge J. JONES.

¶ 1 Plaintiff, Luke Schlapp, a child, appeals the district court's judgment affirming the determination of defendants, the Colorado Department of Health Care Policy and Financing (Department) and Mesa Developmental Services, that he is ineligible for a Medicaid Home and Community Based Services Children's Waiver (Home Services Waiver).[1] We affirm.

## I. Background

¶ 2 By enacting the Colorado Medical Assistance Act, Colorado has chosen to provide home and community-based long-term care services (Services) to certain groups who would not otherwise qualify for federal- and state-funded Medicaid under traditional income guidelines. *See* §§ 25.5–5–202, 25.5–5–203, C.R.S.2011. For each Services group, the state must request a waiver from the Centers for Medicare and Medicaid Services to receive federal funds. 42 U.S.C. § 1396n(c). As relevant here, the General Assembly chose to request the following waiver programs: Home Services Waiver, sections 25.5–6–901 to –902, C.R.S.2011; Children With Autism Waiver, sections 25.5–6–801 to –805, C.R.S.2011; and Children's Extensive Support Waiver, sections 25.5–6–401 to –411, C.R.S.2011.

¶ 3 The Department deemed Luke eligible for a Home Services Waiver in 2006, when he was three or four years old. He received services thereunder until he obtained a Children With Autism Waiver, when he was four years old. Under the Children With Autism Waiver, Luke received occupational, speech, physical, and behavioral therapy services through Medicaid. § 25.5–6–804, C.R.S.2011. However, he became ineligible for that waiver when he turned six in 2009. § 25.5–6–802(1)(b), C.R.S.2011.

¶ 4 Luke applied for a Home Services Waiver to begin upon expiration of the Children With Autism Waiver. Mesa used a standard long-term care assessment tool (ULTC 100.2) to evaluate Luke's eligibility for the Home Services Waiver. *See* Medical Assistance Rules, 10 Code Colo. Regs. 2505–10:8.401, 2505–10:8.506.11(A)(4). In the "Activities of Daily Living" portion of the ULTC 100.2, Mesa determined that Luke's scores were such that he could be eligible for nursing facility level of care.[2]

¶ 5 The Department then reviewed Luke's application to determine, as relevant here, whether Luke had medical needs requiring "hospital or nursing home level of care." In determining Luke's eligibility for the Home

---

1. This waiver is often referred to as HCBS–CW.

2. An applicant may be functionally eligible for "nursing facility level of care" if he scores a "two" or "three" on two or more daily living measures or a two or three in a supervision category on the ULTC 100.2. 10 Code Colo. Regs. 2505–10:8.401.15. Mesa assigned Luke a score of two on the daily living measures of bathing and toileting, and a two or three on both categories of supervision (memory/cognitive deficit and behaviors, respectively). The form also includes assessment of mobility, dressing, eating, and transferring.

Services Waiver, the Department reviewed the portion of the ULTC 100.2 noted above, along with two Professional Medical Information Pages (Physician Pages) provided by Luke's physician, one completed in June 2009 and one completed in September 2009. The June Physician Page stated that Luke had been diagnosed with autism and speech delay, and in the section titled "Other Services Required for Medical Problems," the physician entered "none." The September Physician Page included the medical diagnoses of club foot and asthma, and identified speech, physical, and occupational therapies as other required medical services. Based on these Physician Pages, the Department determined that Luke was ineligible for a Home Services Waiver because he did not require the level of care provided in a hospital or skilled nursing facility.

¶ 6 Luke appealed the Department's decision to an administrative law judge, who affirmed the Department's determination. The Department then affirmed its initial decision, and denied Luke's subsequent motion for reconsideration.[3] Luke appealed to the district court, which initially reversed the Department's decision, but, upon reconsideration, affirmed.

¶ 7 On appeal, Luke contends that the Department erroneously determined that he was ineligible for a Home Services Waiver because (1) the Department improperly considered criteria other than his score on the "Activities of Daily Living" section of the ULTC 100.2; (2) the Department violated the Administrative Procedure Act (APA) by applying a new and unpublished "medically fragile" eligibility requirement; (3) the new requirement is unlawful because it (a) creates a distinction between "medical" and "cognitive/behavioral" needs, and (b) categorically excludes children with autism from eligibility for the Home Services Waiver; and (4) he met all listed eligibility criteria. We address these contentions in turn.

## II. Standard of Review and Interpretation of Administrative Regulations

¶ 8 We review an administrative agency action using the same standard of review as the district court. § 24–4–106(7), (11), C.R.S. 2011; *Kruse v. Town of Castle Rock,* 192 P.3d 591, 601 (Colo.App.2008). We assume an agency action is valid, and therefore will affirm it unless the party challenging it shows that the agency acted arbitrarily and capriciously, contrary to a statutory or constitutional right, without substantial evidentiary support, or otherwise contrary to law. § 24–4–105(7), 24–4–106(7); *Urbish v. Lamm,* 761 P.2d 756, 761 (Colo.1988); *Sapp v. El Paso Cnty. Dep't of Human Servs.,* 181 P.3d 1179, 1182 (Colo.App.2008); *Bethesda Found. of Nebraska v. Colo. Dep't of Health Care Policy & Fin.,* 902 P.2d 863, 866 (Colo. App.1995).

¶ 9 We construe an administrative regulation or rule using rules of statutory interpretation. *Regular Route Common Carrier Conference v. Pub. Utils. Comm'n,* 761 P.2d 737, 745 (Colo.1988). We read the provisions of a regulation together, interpreting the regulation as a whole. *Id.* at 746. Further, we interpret a regulation so as not to conflict with the objective of the statute it implements. *Koch Indus., Inc. v. United States,* 603 F.3d 816, 821 (10th Cir.2010); *Emery Mining Corp. v. Secretary of Labor,* 744 F.2d 1411, 1414 (10th Cir.1984); *see Bd. of Cnty. Comm'rs v. BDS Int'l, LLC.,* 159 P.3d 773, 779 (Colo.App.2006) (county regulations are construed so as to harmonize with applicable state statutes and regulations). When the agency's existing interpretation of its promulgated regulations and enabling legislation is reasonable and not contrary to law, we will defer to that interpretation. *Bd. of Cnty. Comm'rs v. Colo. Pub. Utils. Comm'n,* 157 P.3d 1083, 1088 (Colo.2007); *Colo. Consumer Health Initiative v. Colo. Bd. of Health,* 240 P.3d 525, 528 (Colo.App.2010).

¶ 10 We review a party's challenge to the sufficiency of the evidence supporting an agency's final decision de novo. *Zamarri-*

---

**3.** The initial administrative decision provided that Luke could file written exceptions to that decision with the Department. However, the Department did not receive the entirety of the exceptions until after a final agency decision had been rendered. Thus, the Department treated the exceptions as a motion for reconsideration.

*pa v. Q & T Food Stores, Inc.,* 929 P.2d 1332, 1343 (Colo.1997). But we do not decide the facts; "[w]e examine the record in the light most favorable to the agency decision." *Sapp,* 181 P.3d at 1182; accord *Martelon v. Colo. Dep't of Health Care Policy & Fin.,* 124 P.3d 914, 916 (Colo.App.2005); see § 24–4–106(7). In so doing, we determine whether substantial evidence in the record, viewed as a whole, supports the agency's decision. *Colo. Office of Consumer Counsel v. Pub. Utils. Comm'n,* 786 P.2d 1086, 1091 (Colo. 1990); see § 24–4–106(7). "Substantial evidence is the quantum of probative evidence that a fact finder would accept as adequate to support a conclusion, without regard to the existence of conflicting evidence." *Black Diamond Fund, LLP v. Joseph,* 211 P.3d 727, 730 (Colo.App.2009).

### III. Statutory and Administrative Medicaid Law

#### A. Federal Law

¶ 11 Each waiver request by the Department to the Centers for Medicare and Medicaid Services (CMS) must be limited to one of the following target groups (or a subgroup thereof): (1) aged or disabled, or both; (2) "mentally retarded" or developmentally disabled, or both; or (3) mentally ill. 42 C.F.R § 441.301(b)(6). A request must be accompanied by assurances that the state agency will evaluate, initially and periodically, whether an aid recipient would need the Department-designated level of care (hospital, nursing facility, or, in the case of the mentally retarded, intermediate care facility (ICF/MR)) required for the particular waiver, absent provision of waiver services. 42 C.F.R. § 441.302(c).

¶ 12 In this case, the meaning of hospital level of care is not implicated, but the meaning of nursing facility level of care is. Such care is defined by section 1919(a) of the Social Security Act as care which is

(A) skilled nursing care . . . ,

(B) rehabilitation services . . . , or

(C) . . . health-related care and services to individuals who because of their mental or physical condition require care and services (above the level of room and board)

which can be made available to them only through institutional facilities,

*and is not primarily for the care and treatment of mental diseases . . . .*

42 U.S.C. § 1396r(a)(1) (emphasis added).

#### B. State Law

¶ 13 Section 25.5–6–901 of the Colorado Medical Assistance Act governs the Home Services Waiver program. Consistent with federal Medicaid law, subsection (3)(a)(I) of that statute provides that a Home Services Waiver applicant is eligible for such a waiver only if he has "*medical* needs which would qualify [him], pursuant to state department criteria, for institutionalization or place [him] at risk for institutionalization in . . . [a]n acute care hospital or nursing facility." (Emphasis added.) By statute, therefore, a person at risk of institutionalization only in an intermediate care facility for the mentally retarded does not qualify for a Home Services Waiver.

¶ 14 A state statute defines "nursing facility," in relevant part, as a facility which meets the requirements of 42 U.S.C. § 1396r and provides care by a licensed nurse on a twenty-four-hour basis. § 25.5–4–103(14), C.R.S. 2011. Nursing facilities also include intermediate nursing facilities (as distinguished from intermediate *care* facilities) for the mentally retarded or developmentally disabled. *Id.* As noted, 42 U.S.C. § 1396r includes skilled nursing care in its definition of nursing facility level of care.

¶ 15 The Department has adopted regulations applicable to administration of the Home Services Waiver program. As relevant here, 10 Code Colo. Regs. 2505–10:506, which, among other things, sets forth eligibility guidelines, provides that the program is for "disabled children who are at risk of institutionalization in a hospital or nursing facility," and that the services provided by the program are for "children . . . who meet the established minimum criteria for hospital or nursing facility level of care. . . ." One of the stated eligibility criteria is that the child "is at risk of institutional placement . . . or is in an acute care hospital or nursing facility . . . ." 10 Code Colo. Regs. 2505–10:506.11(A)(2). Another is that the "Utiliza-

tion Review Contractor" (e.g., Mesa Developmental Services) "certifies, through the ULTC–100 (Long term Care Client Assessment Certification and Transfer) form, in conjunction with the Pediatric Functional Assessment Instrument, that the child meets the established minimum criteria for hospital or nursing facility level of care." 10 Code Colo. Regs. 2505–10:506.11(A)(4). The version of the ULTC–100 at issue in this case is the ULTC 100.2, which is used to assist the Department in determining applicants' eligibility for a number of waiver programs.

¶ 16 Other regulations elaborate on the federal and state statutory definitions of nursing facility. "Skilled nursing care" is care provided to persons whose conditions require medical services, including the medical need to visit an attending physician at least once every thirty days, and twenty-four-hour licensed nursing services. 10 Code Colo. Regs. 2505–10:8.408. "Intermediate nursing care" is care to persons who require a physician visit once per calendar quarter and licensed nurse supervision only during the day. 10 Code Colo. Regs. 2505–10:8.409.

## IV. Analysis

### A. The Department Must Consider an Applicant's Medical Need for Hospital or Nursing Facility Level of Care

■ ¶ 17 Luke contends that because 10 Code Colo. Regs. 2505–10:8.401.1.15(D) says that the "ULTC 100.2 shall be the comprehensive and uniform client assessment process for all individuals in need of long-term care," the Department may not consider anything other than the "Activities of Daily Living" section of the ULTC 100.2 to determine his risk of institutionalization in a hospital or nursing facility without violating its own regulations. The Department responds that medical need, as defined by federal and state law, is an eligibility requirement; the ULTC 100.2 includes additional documents that must be considered in assessing an applicant's medical need; scores in the "Activities of Daily Living" section of the ULTC 100.2 are not determinative of eligibility based on medical need; and it has interpreted its reg-

ulations in a manner consistent with, indeed required by, the federal and state statutes it administers.

¶ 18 We conclude that, under the existing regulations, an applicant for a Home Services Waiver *may* be functionally eligible for a waiver based on his "Activities of Daily Living" scores on the ULTC 100.2.[4] However, we also conclude that the Department's interpretation of its regulations is reasonable and therefore entitled to deference.

■ ¶ 19 "Administrative agencies are legally bound to comply strictly with their enabling statutes." *Adams v. Colo. Dep't of Social Servs.*, 824 P.2d 83, 86 (Colo.App. 1991); *see Big Top, Inc. v. Schooley*, 149 Colo. 116, 120, 368 P.2d 201, 203 (1962) (the authority to regulate does not include the authority to make law; the regulator cannot modify or contravene the policy established by the delegator). Agency rules that are inconsistent with or contrary to the statute pursuant to which they were promulgated are void. *Colo. Consumer Health*, 240 P.3d at 528; *Adams*, 824 P.2d at 86 ("administrative rules and regulations are without force and effect if they add to, change, modify, or conflict with an existing statute"); *see A & A Auto Wrecking, Inc. v. Dep't of Revenue*, 43 Colo.App. 85, 87, 602 P.2d 10, 11 (1979).

¶ 20 As explained above, CMS requires that Medicaid waivers target groups separately based on the nature of individuals' disabilities, and specifies that persons with developmental disabilities or mental retardation constitute a separate group. *See* 42 C.F.R. § 441.301(b)(6). The federal regulation delineating the required contents of a Medicaid waiver request provides that the applying state must indicate whether targeted recipients would qualify for the level of care of a hospital, nursing facility, or ICF/MR. 42 C.F.R. § 441.301(b)(1)(iii). In addition, as noted, 42 U.S.C. § 1396r(a)(1) defines the nursing facility level of care as "not primarily for the care and treatment of mental diseases."

---

4. In fact, the Department has determined that Luke is eligible for the Children's Extensive Support Waiver, and he has been on the waiting list for that waiver since at least June 2010.

¶ 21 Subsection (2)(b) of section 25.5–6–901 provides: "If federal financial participation is secured, eligibility for participation in the program and the number of children to be served under the program shall be in accordance with federal regulations." *See Bethesda Found.*, 902 P.2d at 865 (once a state chooses to participate in the Medicaid program, it must comply with the federal statutes and regulations governing reimbursement to nursing homes). Section 25.5–6–901 further provides, consistent with federal law, that only those applicants who have medical needs placing them at risk of institutionalization in an acute care hospital or nursing facility are eligible for a Home Services Waiver. By stating that eligible participants must have medical needs, and specifically excluding ICF/MR institutionalization from the applicable level of care rendering a person eligible for the program, the state Home Services Waiver enabling statute indicates that the waiver is not intended for persons requiring long-term care services only for mental retardation or developmental disabilities. *See Sinclair Mktg. Inc. v. City of Commerce City*, 226 P.3d 1239, 1243 (Colo.App. 2009) (presuming an omission of a provision from a statute is intentional).

¶ 22 As noted, the Department's eligibility guidelines provide that eligibility depends on risk of institutional placement in an acute care hospital or nursing facility. 10 Code Colo. Regs. 2505–10:8.506.11. Indeed, this requirement is stated more than once, and is stated separately from the requirement pertaining to the ULTC 100.2. Additionally, the Department's waiting list guidelines repeatedly refer to "medical need" and provide that "[t]he first child on the waiting list shall be reassessed for medical and financial eligibility" before being assigned an opening, if eligible. 10 Code Colo. Regs. 2505–10.8:506.2.

¶ 23 It is therefore clear that medical need, as defined, is a requirement for Home Services Waiver eligibility, both by statute and by regulation. The regulation specifically relating to the ULTC 100.2, on which Luke relies, also reflects this. 10 Code Colo. Regs. 2505–10:8.401.15(A) states: "When the score in a minimum of two [Activities of Daily Living categories] or the score for one category of supervision is at least a(2), the [entity considering eligibility] *may* certify that the person being reviewed is eligible for nursing facility level of care." (Emphasis added.) In light of the medical need requirement mandated by federal and state statute and reflected in other Department regulations, the Department's construction of the word "may" as permissive rather than mandatory is reasonable. *See Danielson v. Castle Meadows, Inc.*, 791 P.2d 1106, 1113 (Colo.1990) (determining meaning of "may" depends on context and legislative intent); *see also Black's Law Dictionary* 1068 (9th ed.2009) (defining "may" first and second as "[t]o be permitted to" and "[t]o be a possibility," respectively). And it is also reasonable for the Department to construe the word "may" in this regulation as contemplating an ultimate decision based on a showing of medical need.

¶ 24 We also note (and Luke's counsel conceded at oral argument) that the ULTC 100.2 itself includes additional documents, published on the Department website. Among these are the Physician Page and the "Certification Page."[5] These documents are not new; they include footnotes "ULTC 100.2, 09/2007," and "ULTC 100.2, 4/2006," respectively. 10 Code Colo. Regs. 2505–10:8.506.11 specifies that a physician's certification and the "Pediatric Functional Assessment Instrument" also must be used in assessing eligibility for the Home Services Waiver. These documents call for information relevant to a determination of an applicant's medical needs, and therefore support the Department's interpretation of its regulations to require a showing of medical need.

¶ 25 Contrary to Luke's contention, the use of the term "comprehensive" in 10 Code Colo. Regs. 2505–10:8.401.1.15(D) does not

5. The Certification Page asks for "documented medical information supporting" applications to participate in any of six specific programs. The Home Services Waiver requires documented medical information, but the Children's Extensive Support Waiver does not. The Certification Page requires the evaluator to indicate a target group. On the only Certification Page we located in the record, Luke was designated as belonging to the target group "Developmental Disability/M[entally] R[etarded]."

mean that the scores in the "Activities of Daily Living" section of the ULTC 100.2 are the only criteria the Department may consider. We cannot read this regulation in isolation, but must consider it in light of the other Department regulations. And, as noted, a complete ULTC 100.2 must include other information, specifically relating to medical need, and the Department is statutorily required to make a determination based on medical need.

### B. The Medical Need Requirement Is Not New

¶ 26 Luke further contends that the Department exceeded the scope of its authority because the medical need requirement is "new," and the Department did not comply with APA rulemaking requirements before applying it.[6] He asserts that this requirement is "new" because: (1) employees of the Department testified that the Department only began enforcing the medical need requirement after an audit by CMS; and (2) his diagnosis did not change between when the Department found him eligible for a Home Services Waiver in 2006 and when the Department found him ineligible in 2009. We conclude that the requirement is not new and that the Department's enforcement of the requirement is not subject to APA rulemaking procedures.

### 1. The Department May Enforce the Medical Need Requirement Though It May Not Have Done So Consistently in the Past

 ¶ 27 As discussed, the medical need requirement is a fundamental requirement of both federal and state enabling statutes—one which has existed since before Luke initially obtained a Home Services Waiver. And it is clearly set forth in 10 Code Colo. Regs. 2505–10:506.11.

¶ 28 The testimony of Department employees on which Luke relies does not support a contrary conclusion. Two Department employees testified at the administrative hearing that the medical need requirement was not new, but had been inconsistently or improperly applied until an audit by CMS. For example, one employee testified:

> [W]e were not meeting our waiver assurances.... [W]e weren't following our agreements with CMS appropriately.... [W]e weren't holding agencies accountable to the level of care and getting the children on the right waiver. And so the State did begin to enforce some of the rules and regulations that we had in place more stringently than we had in the past.

¶ 29 Thus, the testimony fails to show that the medical need requirement applied to Luke is new; rather, the requirement is being more strictly enforced as a result of a change in enforcement policy—one consistent with the governing federal and state statutes and regulations.

¶ 30 Nor are we persuaded that the medical need requirement is new because Luke's condition allegedly did not change between the time he received a Home Services Waiver in 2006 and his 2009 application.

¶ 31 Though the Department found Luke eligible for a Home Services Waiver in 2006, his original qualifying records are not part of the administrative record before us. At least two years had passed between the original assessment and the one resulting in denial, ample time for a change in Luke's functional abilities.[7] The level of care requirement for Luke's most recent Medicaid waiver, the Children With Autism Waiver, is different from the level of care requirement for the Home Services Waiver. The Children With Autism Waiver merely requires that the applicant be at risk of institutionalization in an ICF/MR. 10 Code Colo. Regs. 2505–10:8.519.4.A.3.

¶ 32 Federal regulations allow a state's home and community-based service waiver to

---

**6.** Luke characterizes the requirement as a showing that the child is "medically fragile," because that is the term the Department used in denying his application. That term is used in the Department's waiver application provided to the federal agency. The Department asserts that "medically fragile" has the same meaning as "medical

need," and given the context we have no reason to question that assertion.

**7.** During a planning meeting with Mesa a few months before the Department denied his application, Luke's parents noted that he had improved functionally in many areas.

cover recipients at risk of placement in three level of care categories: hospital, nursing facility, or ICF/ MR. *See* 42 C.F.R. § 441.301(b)(3). However, the General Assembly chose to limit the Home Services Waiver to only two categories (hospital or nursing facility), thereby excluding persons merely at risk of ICF/MR institutionalization from eligibility under the statute creating the Home Services Waiver program. *See* § 25.5–6–901(3)(a)(I). Because Luke's most recent waiver required only a risk of ICF/MR institutionalization, we are not persuaded that the record shows conclusively that the only change during the time between Luke's assessments was the Department's adoption of an allegedly new requirement.

¶ 33 And, in any event, even if Luke's condition had not changed, that would not preclude the Department from applying the statutorily mandated medical need requirement merely because the Department had not consistently or properly applied it before.

### 2. APA Rulemaking Procedures Do Not Apply to the Department's Enforcement of Existing Rules

¶ 34 The APA requires generally that an agency provide adequate public notice and opportunity to comment before promulgating a new rule. § 24–4–103(1), (3)-(4), C.R.S.2011. But this requirement does not apply to interpretive rules or statements of general policy. § 24–4–103(1).

■ ¶ 35 As discussed above, the Department did not apply a new rule here. Rather, the record shows that the Department merely began interpreting and enforcing its existing regulations more consistently with the governing federal and state statutes and regulations.[8] Luke cites no authority, and we are not aware of any, supporting the proposition that such a change is subject to the procedural requirements for adoption of proposed rules.

■ ¶ 36 We conclude that an agency's reasonable interpretation of existing regulations in a manner required by the relevant enabling statutes is not subject to the legislative rulemaking requirements of the APA. To conclude otherwise would lock an agency into an erroneous interpretation of its regulations and governing statutes, absent further formal rulemaking. In this case, that would mean that the Department would be required to administer the Home Services Waiver program in a way clearly contrary to federal and state enabling legislation, something it obviously may not do. *See Adams*, 824 P.2d at 86.

### C. The Medical Need Requirement Is Not Arbitrary

■ ¶ 37 Luke contends that the Department cannot apply the medical need requirement because the distinction it draws between "medical" and "cognitive/behavioral" needs is arbitrary and contrary to law because it is inconsistent with the Department's regulations and fails to account for the fact that a medical condition, like autism, can manifest itself in a variety of ways. But we have already concluded that the Department's application of the medical need requirement is consistent with the applicable statutes and regulations. And we see nothing in those statutes and regulations which require the Department to determine program eligibility based on the type of illness or disease from which the child suffers, rather than the nature of services needed by the child. The programs distinguish eligibility based on real differences in the types of services required by persons with particular types of needs. Doing so is both rational and consistent with existing state regulations, the state statutes pursuant to which the waiver programs have been promulgated, and the

---

8. Luke does not assert that either the regulation defining skilled nursing facility or the regulation governing Home Services Waiver eligibility was promulgated without proper notice and comment. *See* 10 Code Colo. Regs. 2505–10:8.408, –10:8.506. He does argue that the Department's definition of "nursing facility" is impermissibly narrow and should include facilities other than skilled nursing facilities to conform to other regulations. But because he raises this argument for the first time in his reply brief, we need not address it. *See People v. Czemerynski*, 786 P.2d 1100, 1107 (Colo.1990); *Kopec v. Clements*, 271 P.3d 607, 612 (Colo.App.2011). In any event, there is no indication in the record that Luke is at risk of institutionalization in a nursing facility.

federal statutes and regulations governing Medicaid waivers. Therefore, the medical need requirement, as used to determine Home Services Waiver eligibility, is not arbitrary or capricious.

¶ 38 Nor are we persuaded by Luke's contention that application of the requirement results in the categorical exclusion of children with autism from the Home Services Waiver program.

¶ 39 Neither the relevant statutes nor the waiver regulations include any such categorical exclusion. And in the administrative hearing, a Department representative testified that the Department "do[es] not use diagnoses to determine waiver eligibility. [It] use[s] a functional assessment." A child with autism may have medical needs which would allow him to qualify for a Home Services Waiver, and he would not be excluded based on his autism diagnosis. Not only might individuals with autism spectrum disorders suffer from underlying co-morbid health issues, such as seizures, but they also could suffer from conditions unrelated to their autism diagnoses which would place them at risk of institutionalization in a hospital or skilled nursing facility. Therefore, under the existing law, children with autism may be eligible for Home Services Waivers.

### D. Substantial Evidence in the Record Supports the Department's Decision to Deny Luke's Application

¶ 40 Though Luke asserts that he met every criterion of Home Services Waiver eligibility under the published regulations, we conclude that substantial evidence in the record, considered as a whole, supports the Department's determination that he is not at risk for institutionalization in an acute care hospital or nursing facility. The Physician Pages, completed between 2007 and 2009, state that Luke needs only speech, physical, and occupational therapy services. Luke does not contend that he requires any additional medical care, other than for his club foot. Further, the most recent ULTC 100.2 in the record indicates that Luke's "Activities of Daily Living" scores are largely based on behavioral and cognitive needs, and that his physical impairments (balance problems, in-

continence, and choking due to "shoveling food") are not likely to require skilled nursing care.

¶ 41 The judgment is affirmed.

Judge TAUBMAN and Judge RUSSEL concur.